# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MICHAEL ARMSTRONG and BERYL
ANN GRIEGO

       Plaintiffs,

vs.                                                                                    No. CIV 15-1148 JB/JHR

NEW MEXICO DISABILITY
DETERMINATION SERVICES, DANIEL
ROPER, Director, New Mexico Disability
Determination Services, in his official
capacity, and MIRIAM FERNANDEZ-
RICE, Administrative Law Judge, United
States Social Security Office of Disability
Adjudication and Review, in her individual
capacity

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Dismiss
Complaint, filed March 15, 2016 (Doc. 8)("First Motion"); and (ii) the Defendant's Motion to
Dismiss Complaint Against Administrative Law Judge Miriam Fernandez-Rice, filed April 19,
2016 (Doc. 18)("Second Motion").[1]  The Court held a hearing on August 14, 2017.  The primary
issues are: (i) whether the Social Security Administration ("SSA") must provide reasonable
notice of the name of the person who will conduct a consultative examination or, alternatively,
whether it suffices that the SSA makes that information available upon request; and (ii) whether
Administrative Law Judges ("ALJs") are entitled to absolute judicial immunity when they refer
attorneys who appear before them to the SSA's Office of Disability Adjudication and Review

---

[1]The briefing on behalf of the named Defendants was performed by the Acting
Commissioner of Social Security.

("ODAR") for investigation.  The Court concludes that the SSA needs to make the name of the person who will conduct a consultative evaluation available only upon request and that ALJs are entitled to absolute judicial immunity when making referrals to ODAR for investigation. Consequently, the Court will grant both the First Motion and the Second Motion.

## FACTUAL BACKGROUND[2]

The SSA works with states "to provide and maintain an effective system for processing claims of those who apply for and who are receiving" disability benefits.  20 C.F.R. § 404.1603. State agencies generally make initial "determinations of disability with respect to all persons in the State."  20 C.F.R. § 404.1613.  In New Mexico, the Defendant New Mexico Disability Determination Services ("NMDDS") makes those determinations.  First Amended Complaint for Writ of Mandamus, For Damages For Violation of Civil Rights and for Declaratory Judgment ¶ 4, at 2, filed January 4, 2016 (Doc. 3)("Complaint").  See First Motion at 2.  NMDDS must comply with SSA regulations.  See 20 C.F.R. § 404.1603(a)("The State will comply with our regulations and other written guidelines.").  To help it make disability determinations, NMDDS may ask someone applying for disability benefits to have a consultative examination, i.e., "one or more physical examinations or tests," and NMDDS must give "reasonable notice of the date, time, and place the examination or test will be given, and the name of the person or facility who will do it."  20 C.F.R. § 404.1517.  An applicant may object to the person that NMDDS designates to perform the consultative examination and, "if there is a good reason for the

_____

[2]Because this matter comes before the Court on two motions to dismiss, the Court assumes the truth of the factual allegations in the Plaintiffs' First Amended Complaint for Writ of Mandamus, For Damages For Violation of Civil Rights and for Declaratory Judgment ¶ 2, at 2, filed January 4, 2016 (Doc. 3) and construes those facts in the light most favorable to the Plaintiffs, see Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.").

objection," NMDDS will designate someone else.  20 C.F.R. § 404.1519j.  Defendant Daniel Roper is the NMDDS Director.  See Complaint ¶ 5, at 2.

Plaintiff Michael Armstrong is an attorney who represents individuals seeking Social Security benefits, including disability benefits.  See Complaint ¶ 2, at 2.  On April 29, 2014, the SSA's Office of General Counsel told Armstrong that someone had filed an anonymous complaint against Armstrong alleging that his objections to the consultative evaluations that NMDDS scheduled for his clients "are ethical misconduct, . . . cause delay in the processing of claims, and cause a disruption of proceedings in violation of 20 C.F.R. § 404.1740."  Complaint ¶ 27, at 5.  The anonymous complaint also alleged that "Armstrong's conduct constituted advisement to his clients not to comply with Social Security rules and regulation."  Complaint ¶ 28, at 6.  "On July 22, 2014, the Office of General Counsel advised Plaintiff Armstrong that his actions 'did not appear to violate the Rules of Conduct and Standards of Responsibility for Representatives,' and identified the formerly anonymous complainant as Defendant Fernandez-Rice."  Complaint ¶ 30, at 6.  ODAR employs Fernandez-Rice as an ALJ.  See Complaint ¶ 7, at 3.

Plaintiff Beryl Ann Griego is one of Armstrong's clients who seeks Social Security disability benefits.  See Complaint ¶ 3, at 2.  She currently has a claim pending before NMDDS for disability benefits.  See Complaint ¶ 39, at 7.  NMDDS arranged for a consultative examination for Griego, scheduled the examination for July 25, 2015, and provided notice of the examination to Griego on June 16, 2015, but NMDDS did not tell Griego the name of the doctor who would perform the examination.  See Complaint ¶¶ 42-43, at 7.  On July 14, 2015, Armstrong objected to NMDDS' failure to provide the name of the doctor who would conduct Griego's consultative examination, because that information was required to exercise Griego's

right to object to the person designated to perform her examination. <u>See</u> Complaint ¶ 44, at 7-8. Armstrong advised Griego not to attend the July 25, 2015 examination, and she did not attend. <u>See</u> Complaint ¶¶ 45-46, at 8. NMDDS then scheduled two more consultative examinations; it scheduled one for August 29, 2015, and it scheduled another for November 28, 2015. Complaint ¶ 47, at 8. NMDDS did not provide notice of who would conduct either examination, Armstrong objected to NMDDS's failure to provide that information, and Griego did not attend either examination. <u>See</u> Complaint ¶¶ 48-50, at 8. While none of the three consultative-examination notices listed the name of the doctor who would conduct the examination, all three identified the facility that would perform the examination as "ADVANCED MEDICAL CONSULTANTS SILVERMAN SPINE & INJURY CENTER," and provided its address. Notice of Disability Examination(s) at 1, dated June 16, 2015, filed March 15, 2016 (Doc. 8-1)("June Notice"); Notice of Disability Examination(s) at 1, dated August 19, 2015, filed March 15, 2016 (Doc. 8-1)("August Notice"); Notice of Disability Examination(s) at 1, dated November 18, 2015, filed March 15, 2016 (Doc. 8-1)("November Notice").[3]

## PROCEDURAL HISTORY

The Plaintiffs petition the Court for "a writ of mandamus . . . ordering Defendant Roper to perform his non-discretionary duty as Director of [NMDDS] to Social Security disability applicants with timely notice of the name" of the person who NMDDS has selected to perform a

---

[3]It is proper for the Court to consider the June, August, and November Notices on a motion to dismiss even though they are attached to the First Motion and not the Complaint, because the Complaint references them, <u>see</u> Complaint ¶¶ 43, 48, at 7-8, their adequacy is central to the Plaintiffs' claims, <u>see</u> Complaint ¶¶ 52-53, at 8, and their authenticity is unquestioned, <u>see</u> GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(Kelly, J.)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

consultative evaluation.  Complaint ¶ 56, at 9.  The Plaintiffs also seek monetary damages under

both 42 U.S.C. § 1983 and under Bivens v. Six Unknown Named Agents of the Federal Bureau

of Narcotics, 403 U.S. 388 (1971)("Bivens").  See Complaint ¶ 1, at 1.

### 1.  The First Motion to Dismiss.

On March 15, 2016, "Defendant, Acting Commissioner of Social Security, standing in

place of the named-defendant[s]" NMDSS and Roper, in his official capacity as NMDSS

Director, moved to dismiss the Complaint.  First Motion at 1.  The Defendants assert that the

"Plaintiffs cannot show that a writ of mandamus is appropriate or necessary."  First Motion at 3.

According to the Defendants, mandamus relief is inappropriate, because the "Plaintiffs did not

show that any avenues of relief, much less all, were exhausted to ascertain any medical

provider's name," First Motion at 10, and because, "[h]ad either Ms. Griego or Mr. Armstrong

contacted the NMDSS, the NMDSS could easily have provided the physician's name," First

Motion at 12.  See First Motion at 3 ("[T]he NMDDS is fully amenable to providing the

information upon request . . . .").  According to the Defendants, the Plaintiffs' failure to inquire

about the names of examining physicians should bar mandamus relief, because "[o]ther courts

have refused to grant a writ of mandamus when, like in the case at bar, the petitioner presents no

evidence that other adequate non-judicial remedies were sought before filing the petition."  First

Motion at 15-16 (citing Maddalino v. West, 13 Vet. App. 475 (2000), and Costanza v. West, 12

Vet. App. 133, 134 (1999)).

In the Plaintiffs' Response to Defendant's Motion to Dismiss Complaint, filed April 16,

2016 (Doc. 16)("First Response"), the Plaintiffs argue that mandamus relief is appropriate,

because NMDSS has a nondiscretionary "duty to provide reasonable notice of the names of

medical providers assigned to perform consultative evaluations," First Response at 6, and

because NMDSS has failed to execute that duty, see First Response at 10-14. According to the Plaintiffs, that nondiscretionary duty stems from an SSA regulation requiring NMDSS to provide "reasonable notice . . . of the person or facility who will" perform a consultative examination, 20 C.F.R. § 404.1517, and from another SSA regulation that permits people "to object to your being examined by a medical source we have designated to perform a consultative examination," 20 C.F.R. § 404.1519j. The Plaintiffs also maintain that the SSA's Program Operation Manual System ("POMS") -- "the SSA's administrative manual that dictates agency procedure at the initial determination a[n]d reconsideration stages," First Response at 8 n.4 -- indicates that the initial notice should contain the name of the doctor conducting the consultative evaluation, because POMS contains a model appointment notice template, and "[t]hat template contains a field for 'Name and Address' of the medical evaluator," First Response at 8.

The Plaintiffs also observe that, "[i]n 2011, Plaintiff Armstrong brought a petition for a writ of mandamus very similar to this one," because the SSA "failed to timely disclose the names of medical providers assigned to perform consultative evaluations" for two of his clients "therefore denying his clients of their rights to object to those providers under § 404.1519j." First Response at 7 (citing Memorandum Opinion and Order, Albers v. Social Security Administration, No. CIV 11-0092 (D.N.M. 2011)(Johnson, J.)(Doc. 8-10)("Albers MOO")). The Plaintiffs emphasize that the Albers MOO concluded "that SSA has 'a nondiscretionary duty . . . under [20 C.F.R.] § 404.1517 to disclose the names of the [physicians performing consultative evaluations], and by not doing so, was in violation of its own regulation.'" First Response at 7 (alterations and omissions made by the Plaintiffs)(quoting Albers MOO at 5). The Plaintiffs also note that the Defendants "have already been ordered that compliance with their regulations requires them to 'provide thirty (30) days written notice . . . prior to the date of any

consultative evaluation . . . [including] the name of the evaluating doctor.'" First Response at 9-10 (alterations and omissions made by the Plaintiffs)(quoting Albers MOO at 7).

The Plaintiffs acknowledge that the named parties in the case at bar are different from the parties in Albers; neither Armstrong nor Griegos were plaintiffs in Albers and the SSA, not the NMDSS, was the Albers defendant. See First Response at 8. The Plaintiffs contend, however, that "[t]he reasoning that led Judge Johnson[] to his ruling in Albers should not be discarded solely on the basis that the parties have changed." First Response at 8.

In the Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss Complaint, filed May, 3, 2016 (Doc. 21)("First Reply"), the Defendants argue that the Albers MOO is limited to the two Albers plaintiffs, because the Albers MOO determined that those plaintiffs had no standing to seek "prospective injunctive relief which would affect all notices that DDS sends out to all social security claimants." Albers MOO at 6. See Reply at 5 (quoting Albers MOO at 6). The Defendants also argue the "Plaintiffs' current attempt to make 30 days as the new court-mandated standard based on Albers is without foundation," Reply at 5, because the Albers MOO's specific notice requirements come from a "mutually-agreed draft Order" that the parties submitted and not from SSA regulations, Albers MOO at 7. See Reply at 5. Finally, the Defendants respond to the Plaintiffs' argument based on the POMS model notice template by noting that "[t]he Agency's POMS are merely internal guidelines and operating instructions and are not regulatory requirements." Reply at 6 (citing Washington Dep't of Soc. and Health Servs. v. Keffeler, 537 U.S. 371, 385 (2003)).

**2.      The Second Motion to Dismiss.**

On April 19, 2016, "Defendant, Acting Commissioner of Social Security, standing in place of the named-defendant Miriam Fernandez-Rice," moved the Court to dismiss the

Plaintiffs' claims against Fernandez-Rice. Second Motion at 1. The Defendants argue that the Court should dismiss those claims, because Fernandez-Rice "performed her actions as an administrative judge, and administrative judges are protected by absolute immunity." Second Motion at 2. The Defendants also argue that, even if Fernandez-Rice is not entitled to absolute immunity, at least qualified immunity protects her and requires the Court to dismiss the claims against her. See Second Motion at 2.

In Plaintiff Armstrong's Response to Defendant Rice's Motion to Dismiss Complaint, filed May 27, 2016 (Doc. 25)("Second Response"), Armstrong argues that, by relying on attached exhibits in support of its factual allegations, the Second Motion "has presented 'matters outside the pleadings'" such that, under rule 12(d) of the Federal Rules of Civil Procedure, the Second Motion should be converted to a motion for summary judgment. See Second Response at 3 (quoting Fed. R. Civ. P. Rule 12(d)). Armstrong also argues that Fernandez-Rice is not entitled to absolute immunity as a judge, because "an ALJ referring a suspected violation of the SSA rules pertaining to a representative's conduct acts more akin to a 'complaining witness,' than the prosecutor or adjudicator of the suspected violation." Second Response at 9. He further argues that Fernandez-Rice is not entitled to absolute immunity as a federal official exercising discretion -- vis-à-vis Armstrong's federal claims -- because such immunity applies only to state-tort liability such that "'only a qualified immunity is available to federal officials who have violated *constitutional or federal statutory rights*.'" Second Response at 8 (quoting Strothman v. Gefreh, 739 F.2d 515, 520 (10th Cir. 1984)).

Qualified immunity does not protect Fernandez-Rice, according to Armstrong, because she violated Armstrong's clearly established constitutional rights. See Second Response at 10. Armstrong says that, by the time Fernandez-Rice reported him to ODAR, the Albers MOO

clearly established that "required notices of consultative evaluations to SSA applicants were required to include the name of the individual medical provider who would be conducting the evaluation." Second Response at 12. Armstrong argues that, consequently, clearly established law indicated that Armstrong's right to "petition the Government for a redress of grievances" protected his right to object to inadequate notices. U.S. Const. amend. I. See Second Response at 11.

In a brief reply, the Defendants reiterate that Fernandez-Rice is entitle to absolute immunity as an ALJ, because she "performed her actions in the scope of her employment." Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss Complaint Against Administrative Law Judge Miriam Fernandez-Rice at 4, filed June 14, 2016 (Doc. 26)("Second Reply"). The Defendants again assert that, even if Fernandez-Rice is not entitled to absolute immunity, qualified immunity protects her. See Second Reply at 4.

**3.      The Hearing.**

The Court held a hearing on August 14, 2017. See Transcript of Hearing (taken August 14, 2017)("Tr.").[4]   The Defendants, speaking first, acknowledged that the Albers MOO addressed the Plaintiffs' argument that consultative-examination notices must contain the name of the doctor who will perform the examination. See Tr. at 7:6-13 (Lucero). The Defendants noted, however, that "[J]udge Johnson limited that case to that client and for that determination of disability only." Tr. at 8:2-4 (Lucero). The Defendants elaborated:

> Mr. Armstrong continues to argue the Albers decision as if that were the law of the case, that that was what mandates the way the Social Security Administration will respond to notices and that it requires New Mexico Disability Determination Services to act in accordance with that opinion. It's not. It's pretty clear that

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[J]udge Johnson only wanted and only decided that case for that case only. He didn't want and didn't feel that it was appropriate for him to decide on prospective remedies down the line.

Tr. at 10:19-11:4 (Lucero).

The Defendants then turned to the Second Motion and argued that absolute immunity protects Fernandez-Rice, because absolute immunity "has also been found by the Tenth Circuit to fall to ALJs, just like it falls to magistrate judges, Bankruptcy judges. All federal judges have absolute immunity. If they are doing their job and they are rendering decisions, then they have absolute immunity from suit." Tr. at 14:3-8 (Lucero). According to the Defendants, Fernandez-Rice was acting as a judge when she referred Armstrong to ODAR for investigation, because "[s]he saw something in her official duty while sitting on a case that required some kind of investigation. . . . So she was acting within the scope of her employment as a judge to refer Mr. Armstrong for an investigation." Tr. at 14:16-23 (Lucero).

The Plaintiffs then began by noting that, while the briefing on the First Motion only addresses whether mandamus relief would be appropriate, the Complaint requests not just mandamus relief but also declaratory and injunctive relief. See Tr. at 19:19-20:1 (Sanders). Consequently, the Plaintiffs indicate that deciding the mandamus issue in the Defendants' favor would not "dispose of this case entirely." Tr. at 20:1-4 (Sanders). The Plaintiffs then articulated their view that "[t]he primary issue in this case comes back to the Albers decision, which . . . is dispositive of at least the declaratory judgment and mandamus and injunctive relief requests that we have made." Tr. at 20:5-9 (Sanders). The Plaintiffs then indicated that they sought a declaratory judgment to "expand the ruling in Albers to apply to all those seeking benefits under Social Security disability," because the reasoning of the Albers MOO applied beyond the facts of that particular case. Tr. at 20:14-19 (Sanders).

That statement prompted the Court to inquire whether the Plaintiffs viewed the <u>Albers</u> MOO as persuasive or binding authority.  <u>See</u> Tr. at 20:20-25 (Court).  The Plaintiffs replied that "there is an argument that . . . defendants are collaterally estopped from making arguments regarding what is sufficient notice under these regulations."  Tr. at 21:2-10 (Moore).  The Plaintiffs maintained, however, that, even if the <u>Albers</u> MOO is not binding authority, its reasoning "is at least highly persuasive."  Tr. at 21:10-11 (Moore).

The Plaintiffs later turned to the absolute-immunity issue.  <u>See</u> Tr. at 44:2-6 (Moore).  They argued that, while ALJs are entitled to absolute immunity, that absolute immunity applies only to their judicial acts.  <u>See</u> Tr. at 44:6-45:4 (Moore).  It follows, according to the Plaintiffs, that Fernandez-Rice is not entitled to absolute immunity, because "she merely referred the case to the prosecuting agency" and "had [not] been assigned to oversee the hearing about whether Mr. Armstrong had violated SSA's code of ethics."  Tr. at 45:9-12 (Moore).  The Court then challenged the Plaintiffs by inquiring whether, under their understanding of judicial immunity, a Magistrate Judge's referrals could subject the Magistrate Judge to suit.  <u>See</u> Tr. at 16-21(Court).  The Plaintiffs replied that the key distinction between ALJs and Magistrate Judges is that Magistrate Judges "have some power to sanction attorneys for improper conduct.  They have that power in and of themselves, or at least to make those recommendations," while ALJs do not.  Tr. at 45:22-46:4(Moore).  According to the Plaintiffs, a Magistrate Judge referral is an extension of the Magistrate Judge's judicial power, whereas ALJs do not have a judicial power to discipline attorneys.  <u>See</u> Tr. at 45:2-12 (Moore).

On qualified immunity, the Plaintiffs began to argue that Fernandez-Rice referred Armstrong to ODAR for exercising a right that the <u>Albers</u> MOO clearly established, but the Court interrupted and suggested that only the United States Court of Appeals for the Tenth

Circuit or the Supreme Court of the United States can make clearly established law. <u>See</u> Tr. at 48:4-16 (Moore, Court). The Plaintiffs contended that district court opinions could clearly establish law if "no reasonable officer in the position of the defendant would [think] that the conduct is constitutional." Tr. at 48:17-21 (Moore).

After a brief recess, the Court indicated that it wanted to revisit the Plaintiffs' contention that, even if they failed on the mandamus issue, they might still have a claim for declaratory or injunctive relief. <u>See</u> Tr. at 55:19-56:1 (Court). The Plaintiffs said that they might have a claim for declaratory or injunctive relief if the Court concludes that the Defendants have a duty to provide notice of the names of the doctors who will conduct consultative examination even if the Court concludes that mandamus relief is not appropriate, because it concludes that the duty is discretionary and not ministerial. <u>See</u> Tr. at 56:2-17 (Moore). The Plaintiffs conceded, however, that, "[i]f the court . . . found that [the] Albers decision was mistaken, and that the regulations do not require . . . the timely notice of the names of the providers, then that would be dispositive of the declaratory judgment, and the injunctive relief." Tr. at 56:17-23 (Moore).

On rebuttal, the Defendants attacked the idea that the <u>Albers</u> MOO has collateral estoppel effect, because "Judge Johnson was pretty darned clear that this only -- that case only applied to Albers." Tr. at 68:18-21 (Lucero). The Court suggested that there might be a doctrine that "makes it very difficult to estop the federal government," Tr. at 70:8-9 (Court), and the Defendants' counsel agreed that, "when I started working for the government they said, the United States can't be collaterally estopped," Tr. at 70:16-18 (Lucero). The Court later indicated that a Supreme Court case held that non-mutual, offensive collateral estoppel does not apply to the federal government, and the Court indicated that it would likely treat the <u>Albers</u> MOO as

persuasive authority.  See Tr. at 82:17-84:2 (Court)(citing United States v. Mendoza, 464 U.S. 154 (1984)).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl.

Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must allege facts that, if assumed

to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550

U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.).  "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S.

at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complainant must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d at 1177 (emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."  The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly,

550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not

argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are two exceptions: (i) cases where

the defendant asserts an immunity defense, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-

39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009), and

Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) cases where the facts

establishing an affirmative defense are apparent on the complaint's face, see Miller v. Shell Oil

Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Without converting a motion to dismiss into a motion for summary judgment, a court can consider a document that is "referred to in the complaint and is central to the plaintiff's claim" even though the plaintiff "does not incorporate by reference or attach a document to its complaint" if the defendant "submit[s] an indisputably authentic copy to the court to be considered on a motion to dismiss."  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(Kelly, J.).  See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.)(holding that a defendant's operating certification, which was central to whether plaintiffs adequately alleged a loss and to which the plaintiffs referenced in their complaint, could be considered on a motion to dismiss).

When matters outside of the pleadings are presented to a court on a motion to dismiss, "courts have broad discretion in determining whether or not to accept materials beyond the pleadings."  Lowe v. Town of Fairland, 143 F.3d 1378, 1381 (10th Cir. 1998)(Baldock, J.).  A court should convert a motion to dismiss into a motion for summary judgment if the court considers matters outside of the pleadings, but failing to do so "is harmless if the dismissal can be justified under Fed.R.Civ.P. 12(b)(6) standards without consideration of the matters outside the pleadings."  Lowe v. Town of Fairland, 143 F.3d at 1381.

## LAW REGARDING MANDAMUS

Mandamus -- Latin for "we command" -- is "[a] writ issued by a court to compel performance of a particular act by a lower court or governmental officer or body." Mandamus, Black's Law Dictionary 1105 (10th ed. 2014). Two distinct statutory provisions permit federal courts to issue writs of mandamus, depending on the function a particular writ serves. First, under the All Writs Act, 28 U.S.C. § 1651, federal courts may issue writs of mandamus that are "necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Appellate courts have the "power in a proper case to issue such writs" to constrain the trial courts' actions, but "[t]hese remedies should be resorted to only where appeal is a clearly inadequate remedy," because "[a]s extraordinary remedies they are reserved for really extraordinary cases." Ex parte Fahey, 332 U.S. 258, 260 (1947). See Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380 (2004)("The common-law writ of mandamus against a lower court is codified at 28 U.S.C. § 1651(a) . . . ."). "[O]nly exceptional circumstances amounting to a 'judicial usurpation of power,' or a 'clear abuse of discretion'" justify a writ of mandamus against a lower court. Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367 at 381 (quoting Bankers Life and Casualty Co. v. Holland, 346 U.S. 379, 383 (1953)). Consequently, a petitioner seeking a writ of mandamus against a trial court judge must establish: (i) that the petitioner has no other adequate means to obtain the relief desired, which "ensure[s] that the writ will not be used as a substitute for the regular appeals process," (ii) that the petitioner's "right to the issuance of the writ" is clear and indisputable, and (iii) "that the writ is appropriate under the circumstances," which is a function of the issuing court's discretion. Cheney v. U.S. Dist. Court for D.C., 542 U.S. at 380-81

The second statutory basis for mandamus relief is § 1361 of the Mandamus and Venue Act of 1962, Pub. L. No. 87-748, 76 Stat. 744, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  See generally Clark Byse & Joseph V. Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L. Rev. 308 (1967).  "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."  Heckler v. Ringer, 466 U.S. 602, 616 (1984)(Rehnquist, J.).  Mandamus is thus appropriate to compel agency action only where the agency "has failed to perform a nondiscretionary, ministerial duty."  Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991)(Ebel, J.).  See Estate of Smith v. Heckler, 747 F.2d 583, 591 (10th Cir. 1984)(McKay, J.)("[T]he general rule [is] that mandamus is appropriate where the person seeking the relief 'can show a duty owed to him by the government official to whom the writ is directed that is ministerial, clearly defined and peremptory.'" (quoting Carpet, Linoleum and Resilient Tile Layers, Local Union No. 419 v. Brown, 656 F.2d 564 (10th Cir. 1981))).

Once it has been shown that an agency has failed to perform a ministerial duty, courts have some discretion in fashioning mandamus relief.  See Marathon Oil Co. v. Lujan, 937 F.2d at 500 ("Although the party seeking issuance of a writ of mandamus has a heavy burden of showing that the conditions are clearly met, the issuance of the writ is a matter of the issuing court's discretion." (citations omitted)).  In Marathon Oil Co. v. Lujan, the Tenth Circuit affirmed a district court order granting mandamus relief insofar as the district court required the

Department of the Interior to complete administrative review of "an application for six oil shale mining patents within 30 days." 937 F.2d at 499. The Tenth Circuit reversed the district court order, however, insofar as it directed the Department of the Interior "to approve the application and issue the patents." 937 F.2d at 499. The key distinction is that, "while the district court can compel the defendants to exercise their discretion, it cannot dictate how that discretion is to be exercised." Marathon Oil Co. v. Lujan, 937 F.2d at 501. See Estate of Smith v. Heckler, 747 F.2d at 591 (holding that mandamus is an appropriate remedy, because of the Secretary of Health and Human Services' duty to promulgate nursing-home regulations even though the Medicaid Act [Pub. L. No. 111-3, 123 Stat. 91 (1935)] "vests broad discretion in the Secretary as to how that duty is best accomplished").

## LAW REGARDING OFFENSIVE COLLATERAL ESTOPPEL

Collateral estoppel, or issue preclusion, can be used either defensively or offensively. "In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 329 (1979). Offensive estoppel allows plaintiffs to prevent defendants from contesting issues that they have previously had decided against them. The demise of the mutuality doctrine allows a plaintiff to assert estoppel against a defendant who lost an earlier suit even if the plaintiff was not a party to the earlier suit. The key is not that the defendant had a chance to litigate against the plaintiff, but that the defendant had a chance to litigate the issue, whomever the opponent was.

"The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. at 331. Unfairness to a defendant can result from a variety of situations,

including: (i) if the "defendant in the first action is sued for small or nominal damages [and thus] may have little incentive to defend vigorously, particularly if future suits are not foreseeable"; (ii) if "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; and (iii) if "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. at 330-31. "Courts generally have broad discretion in using offensive estoppel . . . ." Meredith v. Beech Aircraft Corp., 18 F.3d 890, 894–95 (10th Cir.1994).

> Under *Parklane*, if the components of collateral estoppel are satisfied, its benefits of economizing judicial resources and lessening the burdens of relitigating identical issues already decided, would be afforded a non-mutual plaintiff provided defendant had previously had a full and fair opportunity to litigate the issue. Importantly, the decision to eliminate the mutuality requirement to permit the plaintiff such a windfall was placed within the trial court's "broad discretion."

Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir.2000)(quoting Parklane Hosiery Co., Inc. v. Shore, 439 U.S. at 331).

Collateral estoppel applies differently, however, when the federal government is a party. While it is true that "[t]he doctrine of res judicata, of course, prevents the government from relitigating the same cause of action against the parties to a prior decision," it is also true that "nonmutual offensive collateral estoppel simply does not apply against the government . . . to preclude relitigation of issues such as those involved in this case." United States v. Mendoza, 464 U.S. 154, 162 (1984). The federal government is treated differently than private litigants, because "the government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity." United States v. Mendoza, 464 U.S. at 159. Applying nonmutual collateral estoppel to the federal government "would force the Solicitor General to abandon . . . prudential considerations and to appeal every adverse decision in order to avoid

foreclosing further review." United States v. Mendoza, 464 U.S. at 161. Moreover, the government is more likely than private parties to litigate "legal issues of substantial public importance," and "many constitutional questions can arise only in the context of litigation to which the government is a party." United States v. Mendoza, 464 U.S. at 160. Consequently, applying nonmutual collateral estoppel to the federal government would "thwart the development of important questions of law by freezing the first final decision rendered on a particular issue." United States v. Mendoza, 464 U.S. at 160. See id. ("Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari.").

## LAW REGARDING CONSULTATIVE EXAMINATIONS

SSA regulations state that, when the SSA arranges for a consultative examination for a disability-benefits applicant, the SSA will give them "reasonable notice of the date, time, and place the examination or test will be given, and the name of the person or facility who will do it." 20 C.F.R. § 404.1517. SSA regulations also state that a disability-applicant or their representative "may object to your being examined by a medical source we have designated to perform a consultative examination." 20 C.F.R. § 404.1519j. The SSA will reschedule the consultative examination "[i]f there is a good reason for the objection." 20 C.F.R. § 404.1519j.

Good reasons include: (i) that the designated medical source "previously represented an interest adverse to you;" (ii) "the presence of a language barrier;" (iii) "the medical source's office location;" (iv) "travel restrictions;" and (v) "whether the medical source had examined you in a previous disability determination . . . that was unfavorable to you." 20 C.F.R. § 404.1519j. "[T]hat a medical source allegedly 'lacks objectivity' in general, but not in relation to you personally" can also cause the SSA to substitute a different medical source. 20 C.F.R. § 1519j.

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did not create any substantive rights, but merely enforces existing constitutional and federal statutory rights . . . .")(internal quotation marks, alteration, and citation omitted). Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The Court has noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent in their individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal,

556 U.S. 662, 676 (2009). Consequently, there is no respondeat superior liability under § 1983. See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 689 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting 42 U.S.C. § 1983; Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))(internal quotation marks omitted). The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (D.N.M. 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d at 1199). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves

> this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit has noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct." Dodds v. Richardson, 614 F.3d at 1200-01.

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).   The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations." Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING BIVENS ACTIONS

In Bivens, the Supreme Court recognized that citizens may obtain money damages for injuries suffered as a result of federal agents' violation of the Fourth Amendment.  See 403 U.S.

at 395-397. "In <u>Bivens</u> -- proceeding on the theory that a right suggests a remedy -- this Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675 (quoting <u>Correctional Servs. Corp. v. Malesko</u>, 534 U.S. 61, 66 (2001)). <u>See Copar Pumice Co., Inc. v. Morris</u>, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, at *13 (D.N.M., Oct. 23, 2009)(Browning, J.) )(noting that, in <u>Bivens</u>, the Supreme Court held that, "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' 403 U.S. at 396–397."), <u>aff'd</u> 639 F.3d 1025 (10th Cir. 2011).

<u>Bivens</u> suits are "the 'federal analog' to suits brought against state officials under [42 U.S.C.§ 1983]." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675-76. Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Unlike suits under § 1983, <u>Bivens</u> actions do not allow plaintiffs to seek equitable relief; they may seek only damages. <u>See Bivens</u>, 403 U.S. at 410 (Harlan, J., concurring)("For people in Bivens' shoes, it is damages or nothing."). Additionally, a <u>Bivens</u> suit is not available for every alleged constitutional violation that a federal actor commits. The Supreme Court has explained that, where Congress "provides an alternative remedy," which Congress intends "by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself" to preclude a remedy in federal court, a federal court should decline to exercise jurisdiction over the matter under <u>Bivens</u>. <u>Bush v. Lucas</u>, 462 U.S. 367, 378 (1983). A

federal court should also decline to exercise jurisdiction under Bivens when "special factors counseling hesitation," Bivens, 403 U.S. at 396, are present, such as: (i) questions related to federal fiscal policy, United States v. Standard Oil, Co., 332 U.S. 301, 311 (1947); (ii) the "unique disciplinary structure of the military establishment" that a suit seeking damages for the alleged violations of superior officers impacts, Chappel v. Wallace, 462 U.S. 296, 304 (1983); and (iii) that a case "arise[s] out of or are in the course of activity incident to service" in the military, United States v. Stanley, 483 U.S. 669, 684-85 (1987).

## LAW REGARDING JUDICIAL IMMUNITY

"[J]udges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." Stump v. Sparkman, 435 U.S. 349, 355-56 (1978). That same immunity continues even if the judge's "exercise of authority is flawed by the commission of grave procedural errors." Stump v. Sparkman, 435 U.S. at 359.

The Supreme Court has held that the absolute judicial immunity of state judges was not affected or abolished "by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights." Pierson v. Ray, 386 U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982). A judge's immunity from § 1983 liability "is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12 (1991)(citations omitted).

ALJs are likewise "entitled to absolute immunity from damages liability for their judicial acts." Butz v. Economou, 438 U.S. 478, 514 (1978). See id. at 512-13 ("We think that

adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages."). "There can be little doubt that the role of the modern federal hearing examiner or administrative law judge . . . is 'functionally comparable' to that of a judge." Butz v. Economou, 438 U.S. at 513. ALJs can "issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions." Butz v. Economou, 438 U.S. at 513. Judicial immunity applies "however erroneous [a judicial] act may have been, and however injurious in its consequences it may have proved to the plaintiff," and its availability cannot be "affected by the motives with which . . . judicial acts are performed." Cleaving v. Saxner, 474 U.S. 193, 199-200 (1985).

"Only accusations that a judge was not acting in his judicial capacity or that he acted in the complete absence of all jurisdiction can overcome absolute immunity." Guttman v. Khalsa, 446 F.3d 1027, 1034 (10th Cir. 2006)(Lucero, J.). Judicial immunity does not apply to every action a judge takes:

> The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, *i.e.,* whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity.

Stump v. Sparkman, 435 U.S. at 362. See Thomas v. Kaven, 765 F.3d 1183, 1191 (10th Cir. 2014)(Tymkovich, J.)("In determining whether particular acts of government officials are eligible for absolute immunity, we apply a 'functional approach . . . which looks to the nature of the function performed, not the identity of the actor who performed it.'" (omission in the original)(quoting Malik v. Arapahoe Cty. Dep't of Soc. Servs., 191 F.3d 1306, 1414 (10th Cir. 1999))).

In _Duprey v. Twelfth Judicial District Court_, 760 F. Supp. 2d 1180 (D.N.M. 2009)(Browning, J.), the Court concluded that the state defendant who acted as chairperson of the judicial grievance board was entitled to absolute immunity, because his function was similar to that of an administrative law judge in a quasi-judicial setting. See 760 F. Supp. 2d at 1204. The Court concluded that the director of human resources for the New Mexico Administrative Office of the Courts was not entitled to absolute immunity, because her role was ministerial and mechanical. See 760 F. Supp. 2d at 1204. In analyzing each defendant's function, the Court focused on participation in the deliberative process and the exercise of independent judgment. See 760 F. Supp. 2d at 1205. The Court determined that, because the human resources director played a ministerial role and did not act at a judge's direction, she was not entitled to judicial immunity. See 760 F. Supp. 2d at 1208 ("An individual whose job at a judicial proceeding is to run a tape recorder is not one who needs to be able to act according to her own convictions."). See also _Braverman v. New Mexico_, No. 11-0829, 2011 WL 6013587, at *20 (D.N.M. Oct. 19, 2011)(Browning, J.)(concluding that judicial immunity probably protects a state judge and special master from suit when denying a motion for a temporary restraining order).

## LAW REGARDING THE OFFICIAL IMMUNITY OF ALJS

Even when ALJs do not act in their judicial capacity -- and thus are not entitled to absolute judicial immunity -- they may be entitled to absolute immunity from suit because of the official immunity doctrine. See _Strothman v. Gefreh_, 739 F.2d 515, 518 (10th Cir. 1984). That doctrine protects federal officials from tort liability for "'acts done within the framework or scope of their duties which necessarily involve the exercise of discretion which public policy requires be made without fear of personal liability.'" _Strothman v. Gefreh_, 739 F.2d at 518

(quoting <u>Garner v. Rathburn</u>, 346 F.2d 55, 56 (10th Cir. 1965)).  A threefold inquiry determines

whether official immunity applies to a particular act:

> (1) whether the defendant was acting within the scope of his official duties; (2) whether the act complained of involved the exercise of judgment or discretion; and (3) whether a grant of absolute immunity under the circumstances of the case would further the policies underlying the official immunity doctrine.  In making this latter determination, a court should balance the extent to which maintenance of the action would pose a threat to effective government against the harm allegedly suffered by the plaintiff for which he seeks redress.

<u>Strothman v. Gefreh</u>, 739 F.2d at 518.   Because of the official immunity doctrine,

governmental officials are

> free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties -- suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

<u>Barr v. Matteo</u>, 360 U.S. 564, 571 (1959)(Harlan, J.)(plurality opinion).  Official immunity is,

however, more limited than judicial immunity, because it applies only to violations of state tort

law and not to violations of federal statutory or constitutional law.  <u>See</u> <u>Strothman v. Gefreh</u>, 739

F.2d at 520.  <u>See also</u> <u>Butz v. Economou</u>, 438 U.S. at 478 ("[W]e are confident that *Barr* did not

purport to protect an official who has not only committed a wrong under local law, but also

violated those fundamental principles of fairness embodied in our Constitution."); <u>Barr v.

Matteo</u>, 360 U.S. at 577 (Black, J., concurring)("[I]f federal employees are to be subjected to

such restraints . . . , the restraint will have to be imposed expressly by Congress and not by the

general libel laws of the States or of the District of Columbia.")

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."   <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 563 U.S. 692, 705 (2011). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dept. Of Corrections, 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of

the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate,'"  Reichle v. Howards, 566 U.S. 658, 664 (2012)(quoting Ashcroft v. al-Kidd, 563 U.S. at 741), although a case directly on point is not required, see Ashcroft v. al-Kidd, 563 U.S. at 741.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, 633 F.3d 1173 (10th Cir. 2011), that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183. Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## ANALYSIS

The Court determines, as a preliminary matter, that, although the Plaintiffs and the Defendants have both attached matters outside the pleadings to their briefing, the Court will not convert either of the motions to dismiss into a motion for summary judgment. The Court then concludes that SSA regulations do not require NMDDS to provide notice of the name of the individual -- as opposed to the facility -- that it designates to conduct a consultative evaluation. The Court, thus, will grant the First Motion and dismiss the claims against NMDDS and Daniel

Roper. The Court also concludes that, as an ALJ acting in her judicial capacity, absolute judicial immunity protects Fernandez-Rice. The Court will, consequently, grant the Second Motion and dismiss the claims against Fernandez-Rice.

## I. THE COURT WILL EXCLUDE MATTERS OUTSIDE OF THE PLEADINGS, SO IT DOES NOT NEED TO CONVERT THE DEFENDANTS' MOTIONS TO DISMISS INTO MOTIONS FOR SUMMARY JUDGMENT.

Although the Plaintiffs and the Defendants have attached "matters outside the pleadings" to their briefing, the Court will not convert the First Motion or the Second Motions into a motion for summary judgment. See Fed. R. Civ. P. 12(d). Such conversion is necessary only if matters outside the pleadings are both "presented to and not excluded by the court." Fed. R. Civ. P. 12(d). The Court will exercise its discretion to exclude all of the attachments[5] that the Plaintiffs and the Defendants present except for the June Notice, the August Notice, and the November Notice, which the Court considered in determining that NMDDS provided Griego notice of the name of the facility scheduled to conduct her consultative evaluations. See supra at 4. The Court may consider those three documents on a motion to dismiss, because Complaint references them, they are central to the Plaintiffs' claims, and their authenticity is unquestioned. See GFF

---

[5]The Defendants attached correspondence between NMDDS and Armstrong's office to show that Griego received reasonable notice of the individual who would perform her consultative examination's name. The Plaintiffs attached affidavits from Armstrong and Nuno Cardoso, Armstrong's paralegal, to contest that point. See Affidavit of Michael D. Armstrong, dated April 14, 2016, filed April 16, 2016 (Doc. 16-1); Affidavit of Nuno Cardoso, dated April 14, 2016, filed April 16, 2016 (Doc. 16-2). Because the Court concludes that NMDDS complied with SSA regulations by providing the facility's name to Griego, the Court does not need to consider that attached correspondence or affidavits to rule on the First Motion.

In order to show that Fernandez-Rice was not biased against Armstrong's clients, the Defendants attached an affidavit by an ODAR employee stating that Fernandez-Rice ruled in favor of Armstrong's clients 58.18% of the time whereas she ruled in favor of claimants who were not Armstrong's clients 48.18% of the time. Declaration of Melanie Brace (dated April 18, 2016) ¶¶ 4-5, at 2, filed April 19, 2016 (Doc. 18-2). Because the Court that concludes that Fernandez-Rice is entitled to immunity, it does not need to determine whether she was biased against Armstrong's clients in order to rule on the Second Motion.

Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(Kelly, J.)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

## II. BECAUSE SSA REGULATIONS DO NOT REQUIRE NMDDS TO PROVIDE NOTICE OF THE INDIVIDUAL WHO WILL PERFORM A CONSULTATIVE EXAMINATION, THE COURT WILL GRANT THE FIRST MOTION.

The Court must first decide whether the Albers MOO's legal determinations collaterally estop the Defendants in this case. Because the Court concludes that collateral estoppel does not apply, it next analyzes the relevant SSA regulations. The Court determines that NMDDS provides "reasonable notice of . . . the name of the person or facility" that will conduct a consultative examination, 20 C.F.R. § 404.1517, when it provides reasonable notice of the name of the facility that will conduct the consultative examination. Consequently, the Court will grant the First Motion and dismiss the claims against NMDDS and Daniel Roper.

### A. OFFENSIVE COLLATERAL ESTOPPEL DOES NOT PRECLUDE THE DEFENDANTS FROM LITIGATING THE ISSUES IN THIS CASE.

The Court that concludes that the Albers MOO does not collaterally estop the Defendants. The Court has two alternate bases for that conclusion. First, the parties to this case were not parties to the Albers MOO. Second, non-mutual offensive collateral estoppel does not bind the federal government.

Only the parties to a proceeding and those "in privity" with them are collaterally estopped by a judgment rendered in that proceeding. 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4449, at 330 (2d ed. 2017). The Plaintiffs concede that "[c]ertainly the named parties to this case are different." First Response at 8. The closest that

the Plaintiffs come to alleging that any of the parties to this case are in <u>Albers</u> MOO parties is

noting that the SSA was the <u>Albers</u> <u>MOO</u> defendant and that the SSA's Acting Commissioner

filed the First Motion "standing in place of" the named Defendants. First Response at 9 (quoting

First Motion at 1).

"The most direct basis for applying preclusion against a nonparty rests on actual

participation in prior litigation." 18A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice</u>

<u>and Procedure</u> § 4451, at 368. <u>See</u> Restatement(Second) of Judgments § 39 ("A person who is

not a party to an action but who controls or substantially participates in the control of the

presentation on behalf of a party is bound by the determination of issues decided as though he

were a party."). The rationale for that rule is that a party that controlled prior litigation "has had

its day in court and should be concluded by the result." <u>See</u> Restatement(Second) of Judgments

§ 39 cmt. a. That rule indicates, however, that the named Defendants in this case are not bound

by the Albers MOO, because none of them controlled the SSA's presentation in the <u>Albers</u>

MOO. Instead, that rule shows that the SSA will be bound by this case's legal determinations

even though the SSA is not a named Defendant. The <u>Albers</u> MOO, thus, does not bind the

named Defendants.

Collateral estoppel would not apply even if -- because the SSA filed briefing on behalf of

the named Defendants, <u>see</u> First Motion at 1, Second Motion at 1 -- the Court treats this case as a

suit against the SSA. The SSA was a party to the <u>Albers</u> MOO, so the SSA could be bound by

the Albers MOO's legal determinations -- even though the <u>Albers</u> plaintiffs are not present in

this case -- under the ordinary principles of non-mutual offensive collateral estoppel. <u>See</u> 18A

Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 4464, at 692-93.

Non-mutual offensive collateral estoppel does not apply, however, to the federal government.

See United States v. Mendoza, 464 U.S. 154, 162 (1984).  Consequently, the Albers MOO does not collaterally estop the SSA.

>    **B.     NMDDS DOES NOT NEED TO NOTIFY APPLICANTS OF THE INDIVIDUAL CONDUCTING THEIR CONSULTATIVE EXAMINATION'S NAME.**

The Court finds much of the Albers MOO's reasoning persuasive, but it reaches a different ultimate conclusion.  When NMDDS arranges for a consultative examination for a disability-benefits applicant, it must provide "reasonable notice of the date, time, and place the examination or test will be given, and the name of the person or facility who will do it."  20 C.F.R. § 404.1517.  Read in isolation, NMDDS satisfies its notice obligation when it provides reasonable notice of the name of the facility that will conduct the consultative examination, as it did in Griego's case.  See June Notice at 1; August Notice at 1; November Notice at 1.

That reading of the regulation is consistent with the model notification forms that the Plaintiffs cite.  See First Response at 8-9.  The POMS contains two model notification forms. One form has a generic "Name and Address" field, which could refer to the name and address of either an individual or a facility, Model 1 CE appointment notice, filed April 16, 2016 (Doc. 16-4), while the other form calls for the name of the "Medical Evaluator," which suggests an individual, Model 2 CE appointment notice, filed April 16, 2016 (Doc. 16-4).  Taken together, those two forms suggest that § 404.1517 permits NMDDS to provide notice of either the name of a facility or the name of an individual.

As noted by the Albers MOO, however, the analysis becomes somewhat more complicated when one considers 20 CFR § 404.1519l.  See Albers MOO at 4-5.  That regulation provides that applicants "may object to your being examined by a medical source we have designated to perform a consultative examination" and that "[i]f there is a good reason for the objection, we will schedule the examination with another medical source."  20 C.F.R.

§ 404.1519j.  That the regulation contemplates replacing a medical source following an objection indicates that § 404.1519j provides a right to object before an examination occurs.  See Albers MOO at 5.  The right to object, in advance, to a particular medical source would be vacuous if an applicant could not know the name of the designated medical source beforehand.  See Albers MOO at 4.

According to the Albers MOO, medical sources must be individuals, because medical sources must have qualifications that only individuals possess, i.e., they must "be currently licensed in the State and have the training and experience to perform the type of examination or test we will request."  20 C.F.R. § 404.1519g.  See Albers MOO at 4.[6]  An applicant's ability to object, in advance, to the medical source that will conduct their consultative examination thus depends on knowing the name of the individual designated to perform the examination.  See Albers MOO at 4-5.  It follows, again according to the Albers MOO, that § 404.1517 can be satisfied only by providing reasonable notice of the individual -- and not the facility -- who will perform a consultative examination; otherwise an applicant's right to object under § 404.1519j would be meaningless.  See Albers MOO at 5.

The Court takes issue with that last step, because a § 404.1517 notice is not the only way an applicant can learn who will conduct their consultative examination.  Applicants can simply

---

[6]The Court does not find the Albers MOO's reasoning on this point persuasive.  That a medical source must be licensed does not indicate that a facility cannot be a medical source; hospitals, for example, must generally be licensed.  See, e.g., Licensing Requirements - General Hospitals, Texas Department of State Health Services, http://www.dshs.texas.gov/ facilities/hospitals/general.aspx (last updated January 13, 2015).  Just as corporations act through their officers and employees, so too can facilities possess training and expertise by employing natural persons with those qualities.  Because a facility can qualify as a "medical source," as the SSA regulations use that term, that interpretation provides further support for the proposition that providing reasonable notice of a facility's name satisfies § 404.1517's notice requirement.  In any case, the Court reaches that conclusion even if facilities cannot qualify as medical sources.

call and ask.  See June Notice at 1 ("If you have questions, please call (703) 832-7525."). Applicants can thus exercise their right to object under § 404.1519j even if a § 404.1517 notice lists the name of a facility and not an individual.  While § 404.1519j implies that NMDDS has a duty "to disclose the names of the examining physicians," Albers MOO at 5, a duty to disclose is not equivalent to a duty to take affirmative steps to provide notice to every applicant.  Instead, NMDDS complies with its duty to disclose -- implicit in § 404.1519j -- if it makes the names of individuals who will perform consultative examinations available to applicants upon request.

The alternative -- that § 404.1517 notices must contain all information that an applicant needs to object under § 404.1519j -- is untenable.  Applicants can object to "the presence of a language barrier,"  20 C.F.R. § 404.1519j; that possibility does not mean, however, that courts should read a linguistic-disclosure requirement into § 404.1517.  Applicants can also object to "the medical source's office location (e.g., 2nd floor, no elevator)," 20 C.F.R. § 1519j; that possibility does not mean that NMDDS must attach blueprints to its § 404.1517 notices.

Because NMDDS has complied with its duties under the SSA regulations -- by notifying Griego of the name of the facility designated to perform her consultative examinations, see June Notice at 1; August Notice at 1; November Notice at 1 -- the Court will deny the Plaintiffs' petition for a writ of mandamus.  The Plaintiffs conceded at the motion hearing that, "[i]f the court . . . found that [the] Albers decision was mistaken, and that the regulations do not require . . . the timely notice of the names of the providers, then that would be dispositive of the declaratory judgment, and the injunctive relief."  Tr. at 56:17-23 (Moore).  The Court agrees that -- in light of the Court's interpretation of 20 C.F.R. § 404.1517 -- the Complaint does not state a plausible claim for either declaratory or injunctive relief.  Consequently, the Court will grant the First Motion, and dismiss all of the claims against NMDDS and Daniel Roper.

## III.  BECAUSE FERNANDEZ-RICE IS ENTITLED TO ABSOLUTE IMMUNITY, THE COURT WILL GRANT THE SECOND MOTION.

The Court concludes that Fernandez-Rice was acting in her judicial capacity when she referred Armstrong to ODAR for investigation, so she is entitled to absolute judicial immunity. "[W]hether an act by a judge is a 'judicial' one depends on two factors": (i) "the nature of the act itself, *i.e.,* whether it is a function normally performed by a judge"; and (ii) "the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity." Stump v. Sparkman, 435 U.S. 349, 362 (1978).

One "function normally performed by a judge," Stump v. Sparkman, 435 U.S. at 362, is exercising control over judicial proceedings and the attorneys that appear before them.  In the words of Chief Justice Marshall, "[t]he power is one which ought to be exercised with great caution, but which is, we think, incidental to all Courts . . . ."  Ex parte Burr, 22 U.S. 529, 531 (1824)(Marshall, C.J.).  See Chambers v. Nasco, Inc., 501 U.S. 32, 42 (1991)(White, J.)("[T]he Court has held that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it.").

ALJs do not have the same powers as a court established under Article III of the Constitution of the United States of America, see Interstate Commerce Comm'n v. Brimson, 154 U.S. 447, 485 (1894)(Harlan, J.)(stating that an administrative agency "could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment"), but they, too, "must control the hearing,"  Morrell E. Mullins, Manual for Administrative Law Judges, 23 J. Nat'l Ass'n Admin. L. Judges 102 (2004)("ALJ Manual").  See id. at 103 ("An important aspect of the judicial duty is to maintain control of the proceedings.").  An ALJ, no less than any other judge, must

[d]eter counsel who would try to dominate or manage a hearing. The ALJ must be alert to detect and restrain such counsel, whose tactics take many forms. They may stall on cross-examination until noon or evening recess to get time to think of more questions. They may use questionable or even counterproductive tactics to contest the ALJ's rulings: for example, by incessant argument or by repeated inconsequential changes in the form of a stricken question. . . . If these tactics are successful, they may produce in opposing counsel not only animosity but emulation. The resulting record is unmanageable.

. . . .

If tempers become short and an altercation threatens to disrupt the hearing, the ALJ must restore order. . . . If counsel, a witness, or any person in the hearing room becomes unruly or offensive in remarks or manner, the ALJ should assert control, express disapproval of the opprobrious conduct and warn against repetition.

. . . .

A final resort is to exclude counsel from further participation in the case, to take prejudicial action against the client if authorized by statute or rule, **or to recommend disciplinary action by the agency.**

ALJ Manual at 103-04 (emphasis added).

Consequently, when Fernandez-Rice referred Armstrong to ODAR based on an allegation that Armstrong's "objections, on behalf of his clients, to consultative evaluations . . . are ethical misconduct," Complaint ¶ 27, at 5, and on an allegation that Armstrong's conduct "constituted advisement to his clients not to comply with Social Security rules and regulations," Complaint ¶ 28, at 5, she was performing part of her job as an ALJ by regulating the conduct of the attorneys who appeared before her in about the only way the SSA rules permit. Fernandez-Rice was, thus, performing a function ordinarily performed by a judge even though she did not preside over the subsequent ODAR investigation. Cf. Doyle v. Camelot Care Centers, Inc., 305 F.3d 603, 622 (7th Cir. 2002)(determining that two Chief ALJs had absolute immunity concerning their docketing decisions even when those ALJs did not preside over the docketed hearing). Because there is no indication that Armstrong or anyone else expected to deal with

Fernandez-Rice in any capacity other than as an ALJ, the two factors articulated in Stump v. Sparkman are present in this case. It follows that Fernandez-Rice is entitled to absolute judicial immunity for referring Armstrong to ODAR for investigation.

Fernandez-Rice was also acting as a judge when she allegedly exhibited bias towards Armstrong's clients when they appeared before her, see Complaint ¶ 38, at 7, so absolute judicial immunity bars an individual-capacity suit against Fernandez-Rice for such bias. See Cooney v. Rossiter, 2008 WL 3889945, at *5 (N.D. Ill. 2008)(applying absolute immunity to an ALJ's recusal refusal). Consequently, the Court will grant the Second Motion and dismiss all of the claims against Fernandez-Rice, in her individual capacity.

Finally, even if Fernandez-Rice is not entitled to absolute immunity, she is still entitled to qualified immunity. The Albers MOO, as a single unpublished district court Memorandum Opinion and Order, does not qualify as clearly established law, and the Court has found no relevant Supreme Court or Tenth Circuit cases. There is, therefore, no evidence that Fernandez-Rice violated clearly established law, so qualified immunity bars Armstrong's claims against her.

**IT IS ORDERED** that: (i) the Defendant's Motion to Dismiss Complaint, filed March 15, 2016 (Doc. 8) is granted; and (ii) the Defendant's Motion to Dismiss Complaint Against Administrative Law Judge Miriam Fernandez-Rice, filed April 19, 2016 (Doc. 18) is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Maureen A Sanders
Brian L. Moore
Sanders & Westbrook, PC
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

James D. Tierney
  Acting United States Attorney
Manuel Lucero
  Assistant United States Attorney
District of New Mexico
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Gregory E. White
  Special Assistant United States Attorney
Office of General Counsel
Social Security Administration
Dallas, Texas

    *Attorneys for the Defendants*